UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-CR-679 (JEB) |
| ROBERT WAYNE DENNIS | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Wayne Dennis to 64 months' incarceration (the mid-point of the sentencing guidelines range), three years of supervised release, $2,000 in restitution, the mandatory $100 special assessment for each felony conviction, the mandatory $25 special assessment for each Class A misdemeanor, and the mandatory $10 special assessment for each Class B misdemeanor.

I.     INTRODUCTION

The defendant, Robert Wayne Dennis, a 62-year-old art restorer from Garland, Texas, assaulted officers during the January 6, 2021 attack on the United States Capitol—a violent attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360. That amount reflects, among other things, damage to the United

The core of Dennis's criminal conduct occurred at approximately 2:50 p.m., when the Capitol had already been breached and police were under siege.  Dennis, who had already climbed through the scaffolding and ignored the warning sign of tear-gassed rioters, climbed down from the inaugural stage to the Upper West Terrace, where he attempted (unsuccessfully) to gather other rioters with him.  He then advanced up a set of steps to confront a line of Metropolitan Police Department (MPD) officers.  Dennis—unprovoked—grabbed an officer's baton and wrestled another officer to the ground, creating a terribly dangerous situation for the victim, Officer J.S.  More than half a dozen MPD officers were required to restrain Dennis as he kicked, fought, and resisted arrest.

For this conduct, the Court convicted Dennis of two charges of assaulting a law enforcement officer in violation of 18 U.S.C. § 111(a)(1); interfering with a law enforcement officer during a civil disorder in violation of 18 U.S.C. § 231(a)(3); illegally entering and remaining in a restricted area in violation of 18 U.S.C. § 1752(a)(1); and committing acts of violence in a restricted area and on Capitol grounds in violation of 18 U.S.C. § 1752(a)(4) and 40 U.S.C. § 5104(e)(2)(F), respectively.  The government submits that a sentence at the midpoint of the guidelines range of 57-71 months' incarceration would reflect the gravity of Dennis's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

Captain Tia Summers of United States Capitol Police described at trial the January 6, 2021

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

attack on the United States Capitol.  Trial Tr. 01/09/23 (Morning Session), 21-56; Trial Tr.
01/09/23 (Afternoon Session), 3-43.  In short, Summers' testimony and the related video exhibits
established that, among other things, hundreds of rioters breached the security perimeter at the
Peace Circle by approximately 1:00 p.m.; Capitol Police were greatly outnumbered and
overwhelmed by the rioters, many of whom were wearing tactical gear and carrying weapons;
Capitol Police called for reinforcements from MPD and other agencies to help quell the riot; rioters
smashed windows to break into the Capitol Building and hundreds of persons entered the building
without submitting to any security screening; and many rioters assaulted police officers as they
tried, over the course of more than three hours, to defend the Capitol Building and the
Congresspersons and staff inside.  This is the context in which Dennis committed his crimes.

      **B.**     **Robert Wayne Dennis's Role in the January 6, 2021 Attack on the Capitol**

*Dennis's Approach to the Capitol and Advance Up the Inaugural Stage*

Dennis traveled by car with a friend from Texas to Washington, D.C. to attend the "Stop
the Steal" rally on January 6, 2021.  Dennis listened to the speeches at the Ellipse. Trial Tr.
01/10/23 (Afternoon Session) at 79.  After the rally, Dennis "decided to head down with the crowd"
walking to the U.S. Capitol because it was "exciting" that then President Trump had urged the
crowd at the rally to do so.  *Id.* at 83.  At some point, Dennis separated from his companion and
continued toward the Capitol.

Dennis described the atmosphere at the Capitol as "joyous" and "jubilant." Trial Tr.
01/10/23 (Afternoon Session) at 77, 84.[2]  He testified that he did not see any signs indicating that

---

[2] The trial transcripts are not yet publicly available on ECF.  The government has submitted them

the Capitol grounds were closed to the public, he did not see any police barricades, nor did he smell any tear gas or pepper spray as he approached the Capitol.  Trial Tr. 01/11/23 (Morning Session) at 5-6.  Regardless, Dennis admitted that as he climbed through the scaffolding on the West Front, he heard someone say, "Let people come back, they're tear gassing people." *Id.* at 7. He further admitted that he saw people "crying" in response to the tear gas. *Id.* at 11.  Dennis nevertheless continued forward and made his way to the top of the inaugural stage.

In its verdict, the Court found that Dennis "heard of tear gassing and a woman being shot, but he decided to keep going forward to see what was going on."  Trial Tr. 01/13/23 (Morning Session) at 5.  The Court further noted, "there were also people in ballistic gear with gas masks, helmets, et cetera, which the defendant could see was hardly a peaceful group of rally goers but rather plenty of people intent upon confrontation and violent confrontation." *Id.*

*Dennis's Approach to the MPD Police Line*

From the top of the inaugural stage, Dennis observed a line of MPD Officers on the Upper West Terrace.  MPD had formed this line to prevent rioters from gaining access to the Capitol Building via the Senate Wing Door, which had been breached for the second time a few minutes earlier. Dennis saw that these officers were "moving forward" and purportedly "knocking all these people down." Trial Tr. 01/11/23 (Morning Session) at 8.  Video evidence and officer testimony at trial showed that the police formed a line at the top of a set of steps and held out their batons and shields to make clear to the rioters that they should not cross the line.  The Court found that "[p]olice established a clear line with batons and riot shields making clear that entry to the area

directly to defense counsel and the Court via USAfx .

4

was barred, as was entry to the Capitol behind them." Trial Tr. 01/13/23 (Morning Session) at 5. Dennis nevertheless chose to confront these police officers.

At approximately 2:50 p.m., Dennis climbed down a wall to get from the inaugural stage to the Upper West Terrace. Dennis admitted that this climb was difficult for him, but he did it anyway: "I was kind of on the wall like this, and I was trying to figure out how to get down. And I just finally said this is going to hurt, and I went down." *Id.* at 10.

Once on the Upper West Terrace, Dennis tried to rally other rioters to join him in confronting the officers. Dennis testified that he said, "Who's with me?" *Id.* at 12. Although Dennis contended at trial that he was just talking to himself, *id.,* video evidence showed that Dennis was talking in an animated fashion to the rioters around him.

*Dennis's Assault of MPD Officers*

At approximately 2:51 p.m., Dennis deliberately made his way through the crowd on the Upper West Terrace and up the short set of steps separating the rioters from the police line. The Court found, as the video evidence showed, that Dennis approached "with his hands in front of his face" and he "did not stop moving toward the police as he approached them." Trial Tr. 01/13/23 (Morning Session) at 5. *See* Image 1, below.



*Image 1*

Dennis then assaulted Officer C.W. Officer D.P. intervened, as did Officer J.S.  Dennis—despite having an opportunity to retreat down the steps and end the confrontation——then assaulted Officer J.S.   All of this conduct was captured on video by multiple body-worn cameras and a surveillance camera. The Court found that Dennis, not Officer C.W. or any other officer, was the first aggressor, as follows:

> I find that [Dennis] first put his hands on Officer [C.W.'s] baton and made contact with Officer [C.W.'s] right arm, after which the officer to Officer [C.W.'s] right, Officer [D.P.], struck him in the neck area with her baton. Mr. Dennis fell back from that impact and grabbed [D.P.'s] baton. Whether that was for support as he was falling or as an aggressive act is not important, because he is no longer charged with assaulting her. In any event, after he was propped up and supported by the man in the blue jean jacket, he then moved forward to strike Officer [J.S.]. Once again, I find he was the initial aggressor there.

Trial Tr. 01/13/23 (Morning Session) at 6.

In sum, Dennis marched up the steps and assaulted Officer C.W.   When Officer D.P. pushed Dennis off of Officer C.W. and a few steps down the stairway, Dennis chose to assault at least one officer by moving forward to assault Officer J.S.

6

Images 2 and 3 capture Dennis's aggression as he instigated the assault:



*Images 2 and 3*

Officer J.S. testified that Dennis "came up to the police line and like grabbed on to one officer, and he is pushed off. And then he grabbed on to another officer, at which point he was pushed off; then he came to me." Trial Tr. 01/10/23 (Afternoon Session) at 20. The Court found that Dennis "could have retreated after falling back down the stairs, but instead continued forward toward [J.S.]," which the Court found was "an independent decision by the defendant to continue his aggressive actions." *Id.* at 7. Dennis's aggressive actions included grabbing Officer J.S. by the neck, toppling Officer J.S. to the ground, and punching and kicking Officer J.S. and those who tried to restrain Dennis, as captured in Images 4 and 5, below.



*Image 4*



*Image 5*

As shown in Image 6, at least five other officers joined forces to restrain Dennis, which took over five minutes to accomplish.



*Image 6*

As a result of Dennis's assaults, Officers C.W., J.S., and others had to leave the line, weakening the police's defenses as the mob continued to try to breach the Capitol building.[3] Dennis's assaults thereby contributed to the violent riot that prevented Congress from continuing with its constitutionally and statutorily required Joint Session to certify the results of the 2020 presidential election.

In his trial testimony, Dennis contended that he approached the police line because he believed a female rioter wearing red clothing had been assaulted by police.  Trial Tr. 01/11/23 (Morning Session) at 13-15.  The Court, however, rejected Dennis's defense that he acted in defense of others. Trial Tr. 01/13/23 (Morning Session) at 8.  Trial evidence showed that a full 90 seconds elapsed between any physical contact (if there was any) by the police against the "lady in red" and Dennis's assault of the police line, and she was not in any imminent danger of harm at the time.  The Court also noted that "the defense itself has disclaimed any defense of others

_____

[3] Officers C.W. and J.S. did not report that they sustained injuries.

defense." *Id.* at 8.

Dennis also testified that he only wanted to speak to the police, not to assault them. Trial Tr. 01/11/23 (Morning Session) at 13. The Court also rejected Dennis's defense that he was not the aggressor, as described *supra.* Indeed, the video evidence showed that Dennis walked deliberately up to the officers, pointed at them, and acted as the aggressor in assaulting them. Dennis never took the numerous opportunities he had to look back, to stop, or to speak with the officers before physically assaulting them. The Court stated, "I find the defendant's account of the interactions with the officers not credible, because the video undermines it." Trial Tr. 01/13/23 (Morning Session) at 7.[4]

*Dennis's Statements Showing His Intent*

Both on January 6 itself and when interviewed subsequently by the FBI, Dennis indicated that he assaulted the MPD officers because he wanted to enter the Capitol and he was angry that the officers were preventing him from doing so.

On January 6, MPD officers detained Dennis after the assault and brought him to the steps near the southwest area of the Capitol. There, Dennis engaged in conversation with other rioters around him. He commented on what he did that day and that he believed that he had the right to go inside the Capitol. As captured on body-worn camera, at approximately 3:08 p.m., Dennis stated, "I have a right and the government works for we the people not the other way around. We

---

[4]     The government has submitted directly to the Court and defense counsel the slow-motion BWC video clips that were introduced as evidence at trial as Exhibits 1, 2, 3, 4, and 5, which are the slow motion BWC clips that capture the assaults. The Government has also submitted directly to the Court and defense counsel a clip of the CCTV that captured the assault as Exhibit 7.

want to get in to talk to them. They are supposed to let us. We don't live in a free country anymore. This is ridiculous." *See* Exhibit 6 – Full BWC of Officer CC.  Dennis further explained his motive for assaulting police officers as follows: "hey...you all were blocking a house that belongs to we the people." *Id.*

In July 2021, FBI Special Agent Pope interviewed Dennis about his participation in the riot.  During the interview, Dennis admitted that he witnessed violence on the Capitol Grounds and continued to move forward anyway.  Special Agent Pope testified that Dennis admitted in the interview that he had planned a "football rush" up through the police line and tried to get others to go with him:

> Q. Did he tell you what he did next?
>
> A. Yes. He stated that he had climbed down and that he went and found three people to convince to go with him up towards the Capitol.
>
> Q. Did he say anything about his discussion with those three people?
>
> A. He said he was trying to get them to go with him because he couldn't abide what had happened, and that they were going to go up there.
>
> Q. Did he tell you what happened next?
>
> A. Yes. He said it was the dumbest thing he had ever done and that it was an out-of-body experience to where he couldn't stop himself, but he had just planned a football rush up through the police line.
>
> Q. Was "football," in particular, his term or yours?
>
> A. His term.

Trial Tr. 01/09/23 (Afternoon Session) at 9.

## III.    THE CHARGES AND TRIAL CONVICTIONS

On November 17, 2021, a grand jury returned an indictment charging Dennis with nine counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C.  § 111(a)(1) (Counts 2 and 4);

Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 5); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count 7); and Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine). On January 13, 2023, this Court convicted Dennis of those offenses following a bench trial. At the conclusion of trial, the Government dismissed Count 3, a violation of 18 U.S.C. § 111(a)(1), on account of witness unavailability, and the Court held the Government did not meet its burden on two other misdemeanor charges, Count 6 (18 U.S.C. § 1752(a)(2)) and Count 8 (40 U.S.C. § 5104(e)(2)(D)).

## IV.   STATUTORY PENALTIES

Dennis now faces sentencing on Counts One, Two, Four, Five, Seven, and Nine. On Count One, Dennis faces up to five years of imprisonment, three years of supervised release, five years of probation, a fine up to $250,000, and a mandatory special assessment of $100. On Counts Two and Four, he faces up to eight years of imprisonment, three years of supervised release, five years of probation, a fine up to $250,000, and a mandatory special assessment of $100 for each count. On Counts Five and Seven (both class A misdemeanors), he faces up to one year of imprisonment, one year of supervised release, one year of probation, a fine up to $100,000, and a special assessment of $25 on each count. On Count Nine (a class B misdemeanor), he faces up to six months of imprisonment, five years of probation, and a fine up to $5,000, and a special assessment of $10.[5]

---

[5] On January 6 cases, the government generally seeks $2,000 in restitution for felony defendants where this is no additional restitution amount warranted that is specific to the defendant's individual conduct, and we request that amount in this case.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government's Guidelines calculation is set forth below.[6]

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a)[7] | Base Offense Level | 10 |
| U.S.S.G. § §2A2.4(b)(1) | Physical Contact | +3 |
| | | |
| U.S.S.G. § 2A2.4(c)[8] | *Cross Reference to U.S.S.G. § 2A2.2* | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level for § 2A2.2 | 14 |
| U.S.S.G. § 3A1.2(a), (b)[9] | Victim Related Adjustment | +6 |
| U.S.S.G. § 3C1.1[10] | Obstruction of Justice | +2 |
| | **Total** | **22** |

---

[6] Where the PSR determines that two offenses group (such as Counts One and Seven), it does not perform a Guidelines analysis for each count.  However, under Sections 1B.1(a)(1)-(3) of the Guidelines, the Court must, for each count, determine the applicable Guideline, determine the base offense level, apply appropriate special offense characteristics, and apply any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

[7] Since there is no applicable Chapter Two Guideline for 18 U.S.C. § 231(a)(3) in the Statutory Index, the Sentencing Guidelines require that "the most analogous guideline" be used.  U.S.S.G. §2X5.1.  Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

[8] The cross-references applies because this was a felonious assault that involved an intent to commit another felony – 2A2.2 n.1.

[9] Alternatively, this adjustment also applies under U.S.S.G. § 3A1.2(c)(1), where "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."  The evidence showed that the defendant grabbed, punched, and tackled Officer J.S. on the police line on Capitol Grounds on January 6, 2021, which created a substantial risk of causing serious bodily injury to Officer J.S.

[10] The government submits that a two-level enhancement for obstruction of justice applies here based on Dennis's false testimony regarding his assaults of Officer J.S. and Officer C.W., his

13

Counts Two and Four: 18 U.S.C. § 111(a)

| U.S.S.G. §2A2.4 | Base Offense Level | 10 |
| U.S.S.G. §2A2.4(c) | Cross Reference to U.S.S.G. § 2A2.2 | |
| U.S.S.G. §2A2.2(a) | Base Offense Level for § 2A2.2 | 14 |
| U.S.S.G. § 3A1.2(a), (b)[11] | Victim Adjustment | +6 |
| U.S.S.G. § 3C1.1[12] | Obstruction of Justice | +2 |
| | **Total** | **22** |

Count Five: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| | | |
| U.S.S.G. § 2B2.3(c)(1) | *Cross Reference to U.S.S.G. § 2X1.1* | |
| U.S.S.G. § 2X1.1(a)[13] | Apply base offense level and adjustments for intended felony (18 U.S.C. § 231) | |
| U.S.S.G. §2A2.2(a) | Base Offense Level for a violation of 18 U.S.C. § 231 | 14 |
| U.S.S.G. § 3A1.2(a), (b)[14] | Victim Related Adjustment | +6 |

---

interference with Officer J.S., and his knowledge that he believed was lawfully present on Capitol grounds, as set forth *infra*.

[11] Alternatively, this adjustment also applies under U.S.S.G. § 3A1.2(c)(1), where "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense." The evidence showed that the defendant grabbed, punched, and tackled and Officer J.S. (Count Two) and grabbed and pushed Officer C.W. (Count Four) on the police line on Capitol Grounds on January 6, 2021, which created a substantial risk of causing serious bodily injury to Officer J.S. and Officer C.W.

[12] The government submits that a two-level enhancement for obstruction of justice applies here based on Dennis's false testimony regarding his assaults of Officer J.S. and Officer C.W.

[13] U.S.S.G. §2X1.1(a) states that the proper calculation should consist of "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." The substantive offense/intended felony here is Count One: 18 U.S.C. § 231(a)(3).

[14] Alternatively, this adjustment also applies under U.S.S.G. § 3A1.2(c)(1), where "in a manner creating a substantial risk of serious bodily injury, the defendant, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense." The evidence showed that Dennis grabbed, punched, and tackled Officer

| U.S.S.G. § 3C1.1 | Obstruction of Justice | | +2 |
|---|---|---|---|
| | | **Total** | **22[15]** |

Count Seven: 18 U.S.C. § 1752(a)(4)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
|---|---|---|---|
| U.S.S.G. § §2A2.4(b)(1) | Physical Contact | | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | | +2 |
| | | **Total** | **15** |

Count Nine: 40 U.S.C. § 5104(e)(2)(F)

Not applicable. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

*Adjustment for Obstruction of Justice*

The two-level enhancement under U.S.S.G. §3C1.1 is appropriate here based on Dennis's false testimony.[16] U.S.S.G. § 3C1.1's Application Note 4(B) states that "committing . . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies. Application Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement. Whether Dennis committed either type of conduct must be shown only by preponderance of the evidence.

---

J.S. on the police line on the Capitol Grounds on January 6, 2021, which created a substantial risk of causing serious bodily injury to Officer J.S.

[15] The PSR's also miscalculates the adjusted offense level for Group 3/Count 5 (Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)) as 6. As shown below, the proper calculation for Count 5 produces an offense level of 22. *See* PSR ¶¶ 51-56.

[16] The Government, in its response to the draft Presentence Report, did not assert that the sentencing guidelines calculation performed by Probation was in error for not including this enhancement. The Government submits, however, that this enhancement is warranted based on the facts and circumstances here. The Government informed defense counsel of its intent to seek this enhancement on April 4, 2023.

Testifying under oath, Dennis claimed that the officer victims were actually the initial aggressors. He testified that he only intended to talk to them.  He accused the officers of hitting him first with a baton and kicking him. Trial Tr. 01/11/23 (Morning Session) at 13-14.  The Court found these statements not credible.  Moreover, these statements were false, concerned a material matter, and were made with the willful intent to provide false testimony.  Dennis went beyond a mere denial of guilt, lack of memory, or confusion: he offered an alternative, demonstrably false explanation for his confrontation with the police.

This adjustment has been given to other January 6 defendants who gave false testimony regarding their criminal conduct at trial, and it is warranted here.[17]

*Multiple Count Adjustment*

Under U.S.S.G. §3D1.2(c), "closely related counts" are grouped together. Here, Counts One, Two, and Seven group together because Officer J.S. was the victim in each count. The offense level for the group is 22.  Count Four, for which Officer C.W. was the victim, is a separate group (offense level of 22 as well). Count Five, for which Congress was the victim, constitutes a third group (also offense level of 22).

Applying the grouping analysis, these three groups, each of which is equally serious, each constitute one unit. U.S.S.G. §3D1.4 (a). Three total units warrants an increase in offense level of

---

[17] *See United States v. Webster*, 21-cr-208 (APM) (applying the two-level obstruction enhancement after the jury found that the defendant falsely testified that his assaultive conduct was in self-defense); *United States v. Matthew Bledsoe*, 21-cr-204 (BAH) (applying the two-level obstruction enhancement after the defendant falsely testified about his knowledge of the vote certification); *United States v. Thompson*, 21-cr-161 (RBW) (applying the two-level obstruction enhancement after finding that the defendant falsely testified about his whereabouts and other material facts related to his actions on January 6).

three levels, increasing the offense level from 22 to 25.  U.S.S.G. § 3D1.4.

*Sentencing Guidelines Range*

The Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of Dennis's total adjusted offense level at 25, his Guidelines range is 57-71 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Dennis's felonious conduct on January 6, 2021 was part of a massive riot that threatened to prevent the certification vote from being carried out, frustrate the peaceful transition of Presidential power, and throw the United States into a constitutional crisis. Dennis saw a line of police officers on January 6 trying to defend the Capitol and he chose to assault them.  He persisted even after the officers initially pushed him back and he resisted arrest even when surrounded by a group of officers.  The nature and circumstances of Dennis's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 64 months' imprisonment.

### B.  The History and Characteristics of the Defendant

As set forth in the draft PSR, Dennis does not have any criminal history and he has been compliant with the conditions of his pre-trial release. PSR ¶ 65. While the PSR indicates that Dennis has had some illnesses in the past, he currently does not have any major health problems,

drug problems or alcohol problems. *See* PSR ¶¶ 85-101. The PSR also does not suggest that any of Dennis's health problems contributed to his criminal conduct. *See* PSR ¶¶ 93-96.  The history and characteristics of the defendant here are neither significantly aggravating nor mitigating.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Dennis's criminal conduct of assaulting police officers protecting the U.S. Capitol was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[18] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

Dennis does not have any criminal history and he has been compliant with his release conditions.  The seriousness of the instant offense, however, suggests a need for specific deterrence.  Further, in his trial testimony, Dennis refused to take responsibility for his actions and consistently tried to minimize and rationalize his violent conduct, which also indicates the need

---

[18] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

for specific deterrence.

Dennis has still yet to accept responsibility or display remorse for his conduct.  Dennis's actions demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Id*. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

19

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan). [19]

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

---

[19] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[20]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

The sentences in the cases described below follow from each case's own unique circumstances, but they nevertheless provide suitable comparisons to the relevant sentencing considerations in here. Both of these defendants, however, pleaded guilty, and thus they benefited from sentencing guidelines ranges that included adjustments for acceptance of responsibility.

In *United States v. Mazza*, 21-cr-736 (JEB), the defendant pled guilty to violating 18 U.S.C. § 111(a)(1) and a D.C. Code firearms offense.  Like Dennis, Mazza witnessed violence on the Capitol Grounds, and like Dennis, Mazza (using a baton) assaulted an officer.  Mazza also brought two loaded firearms to the Capitol.  This Court sentenced Mazza to 60 months' incarceration. Although Dennis did not have a weapon on Capitol Grounds and did not use a weapon to assault

---

[20] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

an officer, he violently assaulted multiple officers as they were holding a line to protect the Capitol. Moreover, Dennis, unlike Mazza, did not accept responsibility for his conduct; rather, he gave false testimony under oath.

In *United States v. Richardson*, 21-cr-721 (CKK), the defendant, like Dennis, stormed the police line near the West Terrace. Richardson, a 72-year-old man, struck a police officer three times with a pole and helped a group of rioters force a very large metal billboard into the same line of besieged officers. He pleaded guilty to violating Section 111(a).   Judge Kollar-Kotelly sentenced Richardson to 46 months' incarceration.   Richardson, unlike Dennis, did accept responsibility by pleading guilty.

In *United States v. Miller,* 21-cr-119 (CJN), the defendant grabbed at an officer's baton and pushed back against the officer.  Unlike Dennis, Miller pled guilty to violations of 18 U.S.C. §§ 111(a) and 231 and multiple misdemeanors.  His Guidelines range was consequently lower (37-46 months).  Judge Nichols sentenced Miller to 38 months' imprisonment, stating that he would have imposed a higher sentence but for the onerous conditions of Miller's pretrial detention in the D.C. jail. [21]

---

[21] Several non-violent defendants who, like Dennis, did not accept responsibility, have received sentences of 48 months.  *See, e.g., United States v. Williams*, 21-cr-377 (BAH) (48 months' imprisonment); *United States v. Bledsoe*, 21-cr-204 (BAH) (48 months' imprisonment); *United States v. Hale-Cusanelli*, 21-cr-37 (TNM) (48 months' imprisonment).   The government acknowledges that these defendants all entered the Capitol Building and were convicted of a different felony, obstruction of an official proceeding.  But none of them assaulted officers. Assaulting officers at the Capitol on January 6 is a significant aggravating factor; the reports of officers injured and traumatized that day is one of the distinctive tragedies of January 6.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[22] Both require

---

[22] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.   *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v.*

identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[23] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[24] *United States v. Gushlak*, 728 F.3d 184, 196

---

*Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[23] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[24] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.  Here, the Court should find that Dennis's conduct in entering the Capitol building as part of a mob caused damage to that building.

(2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires

imposition of full restitution without respect to a defendant's ability to pay.[25]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Dennis to pay $2,000 in restitution for his conviction on Count One. This amount fairly reflects Dennis's role in the offense and the damages resulting from his conduct. Moreover, in cases arising from the Capitol Riot where the parties have entered into a plea agreement, $2,000 has consistently been the agreed upon amount of restitution, and the amount of restitution imposed by judges of this Court, where the defendant, like Dennis, was not directly and personally involved in damaging property. *See, e.g., United States v. Aaron Mostofsky,* 21 Cr. 138 (JEB) Minute Entry (May 6, 2022). The government also lacks information that the officers suffered injuries that would require

---

[25] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

additional restitution here.  Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 64 months' incarceration, three years of supervised release, $2,000 in restitution, the mandatory $100 for each felony conviction, the mandatory $25 for both Class A misdemeanors, and the mandatory $10 special assessment for the Class B misdemeanor.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

Nialah S. Ferrer
Assistant United States Attorney
New York Bar No. 5748462
601 D Street, NW
Washington, D.C. 20530
(202) 557-1490
Nialah.Ferrer@usdoj.gov

/s/Jason Manning
Jason M. Manning
Trial Attorney, Detailee
New York Bar No. 457868
1400 New York Avenue NW
Washington, DC 20005
(202) 514-6256
Jason.Manning@usdoj.gov